**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 11, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ALISHA N. STRICKLAND,

    Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

    Defendant-Appellee.

No. 11-7077
(D.C. No. 6:10-CV-00272-KEW)
(E.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TYMKOVICH**, **HOLLOWAY**, and **MATHESON**, Circuit Judges.

---

Alisha N. Strickland (Claimant) appeals from an opinion and order entered by

a magistrate judge[1] that affirmed the decision of the Commissioner of Social Security

(Commissioner) denying her application for supplemental security income benefits.

Exercising jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] The parties consented to the jurisdiction of the magistrate judge. *See* 28 U.S.C. § 636(c).

**I.**

Claimant filed an application for benefits in which she claimed disability due to bipolar disorder, depression, anxiety, agoraphobia, and back problems as of June 2006.[2] Following the administrative denial of her claim, Claimant appeared at a hearing before an administrative law judge (ALJ) in 2008. The ALJ issued a decision in which he concluded that she was not disabled. The Appeals Council denied review, and Claimant appealed to the district court, which affirmed the Commissioner's denial of benefits. This appeal followed.

**II.**

Claimant has a high school diploma, two years of college, and one year of business school. Her most recent work was in 1995, when she worked as a nurse's aide. She was 38 years old at the time of the hearing.

The record reflects that in mid-2004, Claimant spent eight days as an inpatient at a psychiatric unit following the death of her father about three months earlier. Upon her release, she was referred to Grand Lake Mental Health Center (Grand Lake) for outpatient therapy. During the next two years, she participated in group therapy sessions led by social workers and counselors. And about once a month, Claimant would meet with J.W. Coonfield, M.D., to review her medications.

---

[2]    Claimant initially alleged an onset date of June 2004, but at the hearing, she amended the alleged onset date to June 2006.

Notes from Grand Lake reflect that Claimant suffered from depression and anger. They also reflect a history of ongoing legal problems, including the placement of her children in foster care. She had a tumultuous relationship with her husband and felt a lack of support from other family members, particularly her mother. She took numerous medications, including Buproprion, Paxil, Neurontin, Klonopin, Remeron, Effexor, Hydroxyzine, and Rozerom. Between March and November 2006, Claimant did not appear for her scheduled meetings, and in early 2007, Grand Lake discharged her because they had not heard from her in the previous ninety days. The discharge diagnosis, completed by a social worker, stated that Claimant suffered from major depressive and borderline personality disorders.

On October 10, 2006, Minor W. Gordon, Ph.D., a state-agency consultative psychologist, met with Claimant for an evaluation. She told Dr. Gordon: "I have an inability to be around people, I find flaws in people and it pisses me off." Admin. R. Vol. 3 at 403. When asked about why she was taking psychotropic medications she responded: "[T]hey told me I was bipolar and I have problems with severe anxiety and depression and my doctor said I possibly had a borderline personality disorder, I had a total 'nervous breakdown' when my dad passed away." *Id*. She described her symptoms of depression and anxiety as follows: "[M]y heart beats fast, I feel lightheaded, I clinch my teeth and I feel I'm not the person I am and all I do is [bawl] and think why am I alive and then I go into the self-pity party." *Id*. When asked to

- 3 -

list her daily activities she said: "I read, go to domestic violence and parenting classes [] to try to get my babies back." *Id*. at 404.

In his review of the medical records, Dr. Gordon mentioned the MRI of Claimant's knee that was performed in 2004, and numerous notes from Grand Lake, including the most recent pharmacological management note from Dr. Coonfield, dated July 11, 2006, which stated:

> Patient is requesting her Klonopin be increased. She said she has made a lot of bad decisions recently. She is very anxious and upset. Her four children are in Cherokee DHS custody. She is living with her mother in Jay. Her husband is in with her today. No current a/v hallucinations, s/h thoughts, plan or intent. She just said that she is not sleeping well and has just generalized anxiety all of the time.

*Id*. at 170, 404.

Dr. Gordon noted that Claimant was "cleanly and neatly dressed and groomed." *Id*. at 404. "Her facial expression is that of an angry 36 year-old female. . . . Her current level of motor activity is close to normal. . . . She gives no evidence of motor control problems. She was attentive and alert and maintained good eye contact. Affectively her mood is one of anger and depression." *Id*.

Relative to cognition, Dr. Gordon observed that Claimant's "social-adaptive behavior reveals difficulty communicating comfortably in a social circumstance secondary to histrionic personality traits as well as secondary to problems with anger. Otherwise she could pass judgement in a work situation, avoid common danger and maintain her own personal hygiene." *Id*. Her thought process was observed to be "coherent," without either "suicidal [or] homicidal ideation." *Id*. Further, she was

- 4 -

"oriented as to time, person and place[,]" and her short-term and long-term memory was found to be "adequate." *Id*. at 405. Dr. Gordon concluded that although "[Claimant] would have difficulty communicating with the general public [she] could communicate with coworkers and supervisors for work purposes. She can be expected to perform some type of routine and repetitive task on a regular basis." *Id*. He assigned Claimant a GAF score of 65.[3]

Cynthia Kampschaefer, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment (MRFCA) on October 30, 2006. Based on her review of the evidence in the file, including Dr. Gordon's evaluation, Dr. Kampschaefer noted that Claimant had marked limitations in three categories: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; and (3) the ability to interact appropriately with the general public. She found no significant limitations as to the seventeen additional categories, which included understanding, memory, concentration, persistence, social interaction, and adaptation. In the narrative section, Dr. Kampschaefer wrote that Claimant "can perform simple tasks with routine supervision[;] can relate to

---

[3]      The GAF is a subjective rating on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32. A GAF of 65 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*. at 34.

supervisors and peers on a superficial work basis[;] cannot relate to the general public[;] [and] can adapt to a work situation." *Id*. at 423.

Claimant testified at the hearing that she had disabling knee and back pain, and that she could sit for about fifteen minutes and stand for about the same length of time: "I'm not []able to sit long periods of time and I'm not able to stand up long periods of time. I have to switch positions quite often." Admin. R. Vol. 2 at 29. According to Claimant, she could walk no further than one-half block before her knees and back began to throb.

Also, Claimant said that she had carpal tunnel syndrome and could not write or type. She said that it was difficult for her to drive "because holding the steering wheel my hands will go to sleep and I don't drive for long distances." *Id*. at 38.

Claimant further testified that she suffered from migraine headaches, which she attributed to a pinched nerve suffered in a car accident. She suffered side effects of dizziness, sleepiness, and nausea from daily insulin injections. And she said she was afflicted with restless leg syndrome and insomnia. According to Claimant, her "neighbor and [] children take care" of household chores. *Id*. at 37.

On a typical day, Claimant said that she would wake up sometime between 5 a.m. and 11 a.m., take a shower, and pick up dishes. Then she would sit on the couch and "try[] to get comfortable and then maybe go[] outside . . . [to] have a cigarette." *Id*. at 39. She would lie down about two times a day to relieve pain. She engaged in no other activities whatsoever.

As to the impact of her mental impairments on her daily activities Claimant testified:

> I'll sit there and whenever the depression hits [which she said was three or four times a week], I'll crawl up back in my little shell, I call it. And I don't want to be bothered by nobody. I don't want anyone coming over. I don't want to have anything to do with anyone. I cry uncontrollably. I can't breathe. I can't drive. I can't, I just want to be left alone, even with the children. They know whenever I've got some depression going on and they come and they try to cheer me up and I'm like, no, go away.

*Id*. at 41.

She added that she had mood swings brought on by people "trying to give me orders to do this or do such and such, I'll get mad at them because I'll think they're bossing me around." *Id*. at 42. Claimant testified to recent feelings of wanting to hurt other people, and described a desire to shoplift. According to Claimant, she had problems with her short-term and long-term memory, and experienced audio hallucinations.

At the hearing, the ALJ asked the vocational expert (VE) two hypothetical questions. The first question asked the VE to assume an individual the same age and educational background as Claimant who could perform a full range of medium, light, and sedentary work, but who "has been diagnosed as having affective disorder as well as personality disorder." *Id*. at 48. With those limitations in mind, the ALJ explained that "she would be able to perform simple tasks with routine supervision. She can relate to coworkers and supervisors on a superficial basis and she could not relate to the general public. She can adapt to her work situation." *Id*. The VE

- 7 -

opined that Claimant could not return to her previous work as a nurse's aide because that involved dealing with the general public. The VE said, however, that an individual with these limitations could perform the jobs of medium janitorial work, medium stock clerk, light exertion food preparation worker, and sedentary assembly work.

The second hypothetical asked the VE to assume that Claimant's testimony was credible and that she suffered the full effects of all the mental and physical impairments she described. According to the VE, that individual "wouldn't be able to keep a job and work eight hours a day, five days a week." *Id*. at 50.

### III.

The ALJ applied the five-step sequential-evaluation process to determine whether Claimant was disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (summarizing the five-step process). At step one, the ALJ noted Claimant had not engaged in substantial gainful activity since June 28, 2006, the alleged onset date. At step two, the ALJ found Claimant "has the following severe impairments: Major Depressive Disorder, Single Episode, anger management problems, and histrionic and borderline personality traits." Aplt. App. Vol. 2 at 16. At step three, he determined that none of the impairments met or equaled any of the per se disabling impairments listed in 20 C.F.R. Part 404, Subpart P., Appendix 1. At step four, the ALJ found that Claimant has the residual functional capacity (RFC) to

perform a full range of work at all exertional levels with the following nonexertional limitations:

> [O]nly simple tasks with routine supervision and no interaction with the general public. The claimant has affective disorder and personality disorder. But, she is able to relate superficially to coworkers and supervisors and she can adapt to work situations. Although afflicted with psychological symptoms and on medications, she can remain attentive and alert.

*Id*. at 18. At the final step, the ALJ concluded that Claimant was not disabled because there were significant jobs in the national economy that she could perform.

**IV.**

Our review is limited to those issues properly preserved in the district court and adequately presented on appeal. *Krauser v. Astrue*, 638 F.3d 1324, 1326 (10th Cir. 2011). And we review the issues adequately presented on appeal to determine whether the Commissioner's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). In other words, "[w]e consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's." *Id*. (quotation omitted). "We review only the *sufficiency* of the evidence, not its weight[.]" *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,]

- 9 -

[and] requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084 (quotation omitted).

**V.**

Claimant challenges the Commissioner's decision on the grounds that the ALJ did not perform (1) a proper determination at step five; (2) a proper analysis of the medical evidence; and (3) a proper credibility determination. Each of these arguments contains several sub-arguments. Our task has not been easy because Claimant's briefs are poorly organized and in many instances, her arguments are not properly developed. Additionally, most of Claimant's arguments are contrary to this court's case law and she makes no effort to distinguish the facts of her case or to argue for an extension of existing law.

### A. The ALJ's Step-Five Determination

The VE testified that an individual with the limitations found by the ALJ could perform the jobs of janitorial worker and stock clerk, which the VE said were "medium" jobs, the job of food preparation worker, which the VE said was "light" work, and assembly worker, which the VE said was a "sedentary" job. We agree with Claimant that there were errors in the VE's testimony. First, the job number the VE gave for the janitorial job was classified as "heavy" work. Although there is a janitorial job classified as "medium," that was not the job number provided by the VE. The second error occurred when the VE misidentified the assembly job as

"sedentary" work, when it is "light" work.  But we disagree that these errors require a remand.

In *Raymond v. Astrue*, 621 F.3d 1269 (10th Cir. 2009), the claimant argued that the ALJ erroneously concluded that he was able to obtain gainful employment because one of the jobs testified to by the VE exceeded the limitations found by the ALJ.  We rejected that argument, holding that "[e]ven assuming without deciding that [the claimant] is unable to work as a sales attendant or office helper, there is no colorable dispute that substantial record evidence supports the ALJ's conclusion that he can work as a rental clerk."  *Id*. at 1274.  As in *Raymond*, the ALJ's conclusion that Claimant can work as a stock clerk, assembly worker, or food preparation worker is supported by substantial evidence.  Thus, any errors in the VE's description of the various jobs were harmless.

Claimant's next arguments concern alleged errors by the ALJ in his questioning of the VE.  As an overarching argument, Claimant argues that the ALJ erred in not complying with SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000), which requires an ALJ to inquire about and resolve any conflicts between a VE's testimony and the definition of a job in the Dictionary of Occupational Titles (4th ed. 1991) (DOT).  For example, a job description in the DOT might list additional duties that could potentially conflict with limitations that the ALJ has found to exist.  While we agree generally that the ALJ should have inquired about conflicts, Claimant has not pointed to any information in the DOT that creates a conflict.  Simply put, because

there are no conflicts, the error was harmless.  *See Poppa v. Astrue*, 569 F.3d 1167, 1174 (10th Cir. 2009) ("Because there were no conflicts between the VE's testimony and the DOT's job descriptions, the ALJ's error in not inquiring about potential conflicts was harmless.").

Next, Claimant argues that she cannot perform the job of stock clerk because it requires her to "frequently stoop and crouch, and occasionally kneel."[4] Aplt. Opening Br. at 19.  This argument lacks merit for two reasons.  First, there is no evidence in the record other than Claimant's testimony, which the ALJ found was not credible, that she is limited in these functions.  Thus, the ALJ did not err in failing to include these limitations in his questions to the VE.  *See Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000) ("The hypothetical presented to the vocational expert was [] sufficient, in that it contained all of the limitations found to exist by the ALJ.").  Second, even if the ALJ should have included these limitations, there is no evidence that there are not a sufficient number of jobs in the two remaining categories (food preparation worker and assembly worker) that Claimant can perform.  *See Evans v. Chater*, 55 F.3d 530, 532-33 (10th Cir. 1995) (holding that the Commissioner satisfies his burden at step five by demonstrating that there are one or

---

[4]     Claimant apparently acknowledges that she could perform the jobs of food preparation worker and assembly worker, because they do not require her to stoop, crouch, or kneel.  But with regard to the job of food preparation worker, Claimant says that the VE gave the wrong DOT number for this job.  Whether the VE misspoke or there was an error in transcription does not matter.  Claimant has failed to provide any evidence that she cannot perform the job of food preparation worker, regardless of the number attributed to it in the DOT.

more jobs in significant numbers that the claimant is able to perform with her physical and mental limitations).

We also reject Claimant's argument that the ALJ should have included back pain and migraine headaches in his questions to the VE. As a general proposition, we agree that an ALJ is required to include all limitations, severe and non-severe, in his hypothetical questions to the VE. But the ALJ did not find any limitations in these areas, and he was not required to include them in his questions. *See Barnett*, 231 F.3d at 690.

**B. The ALJ's Analysis of the Medical Evidence**

Claimant argues first that the ALJ misapplied the law because he failed to "explain[] the weight he assigned to [the] opinion[s] [of Drs. Gordon and Kampschaefer]," Aplt. Opening Br. at 20 (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1223 (10th Cir. 2004), which holds that "[i]f an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it."). There are two circumstances that give context to the above holding and easily distinguish *Hamlin* from Claimant's case. In *Hamlin*, the opinion of a non-examining physician was in conflict with the medical opinions of the claimant's treating physicians. In Claimant's case, there are no conflicting medical opinions. Most important, the ALJ in *Hamlin* failed to discuss or even cite the opinion of the non-treating physician (or any other evidence for that matter) in formulating the

claimant's RFC.  In this case, the ALJ cited and discussed both reports in formulating Claimant's RFC.

The next argument is that the ALJ should have ignored Dr. Kampschaefer's opinion entirely because there was a conflict between the limitations she listed in the Psychiatric Review Technique Form (PRTF) and the limitations she found in the MRFCA.  In the PRTF, Dr. Kampschaefer found that Strickland has moderate limitations in concentration, persistence, and pace.  In the MRFCA, Dr. Kampschaefer found no such limitations.  Strickland faults the ALJ for "fail[ing] to note the inconsistency[.]"  Aplt. Opening Br. at 22.  Setting aside the different purposes served by the two forms, because the ALJ found that Claimant had a moderate limitation in concentration, persistence, or pace, we perceive no error.

In a related vein, Claimant says that the ALJ should have rejected Dr. Kampschaefer's opinions because she "ignored nearly all of the evidence contained in the [Grand Lake] therapy records in completing . . . [the MRFCA], relying almost exclusively on the report of [Dr. Gordon]."  *Id*. at 22.  This assertion is wrong.  To be sure, Dr. Kampschaefer did not mention every detail in the notes from the Grand Lake group therapy sessions, such as the fact that Strickland sometimes had "body odor" and "us[ed] expletives to express herself."  *Id*.  But Dr. Kampschaefer did consider Claimant's history of anger, irritability, depression, legal problems, violent and abusive personal relationships, and histrionic personality traits, just to mention a few, in formulating the MRFCA.  Moreover, the ALJ was not

- 14 -

in a position to second-guess Dr. Kampschaefer. We have repeatedly stressed that an ALJ may not interpose his own judgment over a physician with respect to medical findings. *Lax*, 489 F.3d at 1089; *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir. 1996).

The next group of arguments advanced by Claimant concern her GAF scores. When Claimant began outpatient treatment at Grand Lakes in mid-2004, the counselors noted that her GAF was 42, and had been as high as 52 during the previous year. When Claimant was let go from Grand Lake in January 2007 as a result of her failure to attend therapy sessions, the social worker who closed the file estimated Claimant's GAF at 38, with a high of 42 during the previous year. In his decision, the ALJ noted that Claimant received a GAF score of 65 from Dr. Gordon when he examined her in October 2006. The ALJ did not specifically mention the earlier GAF scores from Grand Lake in his decision.

Claimant's argument is two-fold. First, Claimant argues that according to the VE's testimony, "she was disabled from at least June 2004 through January 2007, and should have been considered for a closed period of disability." Aplt. Opening Br. at 26. We do not address the issue because this one-sentence statement does not adequately develop the argument. *See* Rule 28 (a)(9)(A) of the Federal Rules of Appellate Procedure, which requires the opening brief to identify "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." *See also Krauser*, 638 F.3d at 1326.

Next, Claimant argues that the ALJ ignored the testimony elicited by Claimant's lawyer from the VE that an individual with "a prolonged low GAF score between 38 and 43 . . . would not be able to sustain work."[5] Aplt. Opening Br. at 25. Claimant's lawyer made this identical argument in a case that we decided more than a month before he filed his opening brief in this case. *Luttrell v. Astrue*, 453 F. App'x 786, 791-92 (10th Cir. 2011). In *Luttrell*, we explained why it was not necessary for the ALJ to specifically mention or adopt every GAF score in his decision. Claimant never cites *Luttrell* and never explains why the result should be different in this case. In any event, we rejected this argument in *Luttrell*, and we reject it again in this case.

## C. The Credibility Determination

Claimant objects to the ALJ's credibility finding on the ground that the he "did not relate the reasons for his finding to the evidence of record, as required." Aplt. Opening Br. at 26. In particular, Claimant criticizes as meaningless boilerplate, a sentence from the ALJ's decision that states: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statement concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual

---

[5]    Claimant's lawyer asked the VE: "[I]f we had an individual with a global assessment functioning of a 38 and the highest level of that global assessment functioning over a year time period would be a 43, would such an individual with that extended level of global assessment functioning scores be able to sustain work in your opinion?" Aplt. App. Vol. 2 at 51. The VE responded: "No." *Id.*

functional capacity assessment for the reasons explained below." Aplt. App. Vol. 2 at 19. If this were the only factor that the ALJ mentioned in his decision to explain why he found Claimant less than credible, this might be a valid argument. For example, in *Kepler v. Chater*, 68 F.3d 387, 391-92 (10th Cir. 1995), we found the ALJ's credibility determination was inadequate because the ALJ did nothing more than cite the general factors he considered and then said the claimant was not credible based on those factors. Because the ALJ in *Kepler* did not refer to any specific evidence relevant to those factors, this court could only guess what evidence the ALJ relied on in evaluating the claimant's credibility, and we remanded the matter for clarification. But this case is different. The ALJ did not simply recite the general factors - he also stated the specific evidence he relied on in determining that Claimant's allegations were not credible. As a few examples, the ALJ noted that Claimant testified to "alleged carpal tunnel syndrome, back, neck, and knee pain, migraines, and diabetes." Aplt. App. Vol. 2 at 16. The ALJ then explained why the scant medical evidence in the record did not support either the existence in some cases, or in other instances, the alleged severity of the impairments. The ALJ also wrote two pages about why Claimant's testimony concerning the effects of her mental impairments, coupled with the records from Grand Lake, were at odds with Dr. Gordon's opinion. This court "does not require a formalistic factor-by-factor recitation of the evidence." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). Instead, the ALJ's determination is sufficient so long as it "sets forth the specific

evidence he relie[d] on in evaluating the claimant's credibility." *Id.* The decision

meets this test.

The judgment of the district court is AFFIRMED.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge